UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT K. DECKER,

        Plaintiff,                                    Case No. 19-cv-11654
                                        Hon. Matthew F. Leitman

v.

UNITED STATES OF AMERICA,

        Defendant.

_____/

## ORDER (1) OVERRULING PLAINTIFF'S OBJECTIONS (ECF No. 296) TO REPORT AND RECOMMENDATION (ECF No. 292), (2) ADOPTING RECOMMENDED DISPOSITION OF REPORT AND RECOMMENDATION, (3) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 271), AND (4) DENYING PLAINTIFF'S MOTION FOR ASSISTANCE WITH RECRUITING COUNSEL (ECF No. 304)

In this action, *pro se* Plaintiff Robert K. Decker alleges that certain law enforcement officers, including federal agents employed by the United States Department of Justice, unlawfully searched his residence without a search warrant. Only one claim remains alive: Decker's claim for trespass under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (the "FTCA") against Defendant United States of America. (*See* Fourth Am. Compl., ECF No. 135; Order, ECF No. 233.) The United States has now filed a motion for summary judgment on that claim. (*See* Mot., ECF No. 271.) The United States argues that it is entitled to summary judgment on three grounds: (1) Decker failed to exhaust his administrative remedies under the FTCA;

(2) Decker's claim is barred by issue preclusion; and (3) Decker's claim is barred by the "detention of goods" exception to the FTCA.[1]  On May 27, 2025, the assigned Magistrate Judge issued a Report and Recommendation in which he recommended the Court grant summary judgment in favor of the United States on the basis that Decker failed to exhaust his administrative remedies (the "R&R"). (*See* R&R, ECF No. 292.)  Decker has now filed objections to the R&R. (*See* Obj., ECF No. 296.) For the reasons explained below, the objections are **OVERRULED**, and the United States' motion for summary judgment is **GRANTED**.  In addition, Decker's motion for the appointment of counsel (ECF No. 304) is **DENIED**.

## I

## A

In August of 2016, Decker owned a residence at 5745 Artesian Street in Detroit, Michigan. (*See* Decker Dep. at 12:4-6, ECF No. 271-2, PageID.1876.)  He also rented a residential property across the street, located at 5754 Artesian Street. (*See id.* at 38:17-19, PageID.1877.)

On August 17, 2016, a judicial officer issued search warrants for both of Decker's properties. (*See* 5745 Artesian Search Warrant, ECF No. 271-4; 5754

---

[1] As described in more detail below, the Court concludes that Decker's claim is barred because he failed to exhaust his administrative remedies.  Accordingly, the Court need not, and does not, reach the United States' second and third summary judgment arguments.

Artesian Search Warrant, ECF No. 271-7.)   Law enforcement officers searched both properties that same day.

According to Decker, the officers searched the residence at 5754 Artesian Street before the judicial officer signed the warrant for that residence.   He thus contends that the search of those premises was "warrantless." (Decker Mot. for Relief from Criminal Judgment, ECF No. 271-11, PageID.1939.[2])

## B

Following the searches of Decker's residences, he was charged with conspiracy to distribute a controlled substance and conspiracy to commit money laundering in the United States District Court for the Southern District of Florida. (*See* Indictment, ECF No. 271-8.)   He later pleaded guilty to both of those charges. (*See* Plea Agreement, ECF No. 271-9.)   United States District Judge Donald M. Middlebrooks thereafter sentenced Decker to 140 months in prison on both counts of conviction, to run concurrently. (*See* Judgment, ECF No. 271-10, PageID.1930.)

## C

More than three and a half years after Decker was sentenced, Decker filed a motion to vacate his convictions and sentence under 28 U.S.C. § 2255. (*See* Decker Mot. for Relief from Criminal Judgment, ECF No. 271-11.)   In that motion, Decker

---

[2] The judgment mentioned in the title of the motion in the citation above was entered in criminal proceedings against Decker.  Those proceedings are described in Section (I)(B) immediately below.

argued, among other things, that his counsel was ineffective for failing to investigate the search of his home at 5754 Artesian Street. (*See id.*, PageID.1939; Decker Reply Br., ECF No. 271-12, PageID.1956.)   Decker contended that if counsel had conducted a reasonable investigation, he would have discovered that the search of those premises occurred before the judicial officer signed the search warrant and was, therefore, "warrantless." (*Id.*)   Decker further appeared to imply that his attorney could then have successfully moved to suppress the evidence seized during that search. (*See id.*)   And Decker seemed to suggest that there was a reasonable probability that the result of the criminal proceedings would have been different absent the unlawfully-seized evidence. (*See id.*)

Judge Middlebrooks denied Decker's motion in a written order. (*See* Fla. Dist. Ct. Order, ECF No. 271-13.)   In that order, Judge Middlebrooks concluded, among other things, that "[t]here was no 'warrantless' search" of 5754 Artesian Street. (*Id.*, PageID.1963.)

## D

At some point in 2018, Decker determined that he wished to pursue a tort claim against the United States based upon what he believed was the warrantless search of 5754 Artesian Street.   Decker understood that before he could pursue such a claim in federal court, he needed to administratively exhaust the claim by presenting it to the Department of Justice.   But at that time, Decker was serving the

4

140-month sentence imposed on him at the federal prison in Terre Haute, Indiana. He was therefore not able to personally mail (or otherwise personally present) his claim to the Department of Justice.  So, according to Decker, on June 16, 2018, he completed an administrative claim form setting forth his claim based upon the allegedly-unlawful search and gave the claim form to a Bureau of Prisons staff member to be mailed to the Department of Justice. (*See* Decker Dep at 98:8-25 – 100:1-25, ECF No., 271-2, PageID.1888-1890.)

While Decker claims that he handed the claim form to a Bureau of Prisons staffer for mailing, the Department of Justice has presented evidence that it never received the form. (*See* Declarations, ECF Nos. 271-17, 271-18, 271-19, 271-20, 271-21, 271-22.)  That evidence is undisputed.

**E**

On June 5, 2019, Decker filed this action in this Court. (*See* Compl., ECF No. 1.)  The currently operative Complaint in this case is Decker's Fourth Amended Complaint. (*See* Fourth Am. Compl., ECF No. 135.)  One claim remains alive: Decker's claim against the United States under the FTCA for trespass based upon the allegedly-warrantless search of 5754 Artesian Street. (*See* Order, ECF No. 233, PageID.1672.)

The United States has moved for summary judgment on that sole remaining claim on December 18, 2024. (*See* Mot., ECF No. 271.)  As relevant here, the United

States contends that it is entitled to summary judgment because Decker failed to exhaust his administrative tort remedies under the FTCA.  More specifically, the United States argues that (1) a plaintiff must exhaust the administrative remedies available for a tort claim before bringing that claim under the FTCA, (2) the FTCA provides that in order to exhaust those remedies, a claimant must "present[]" his claim to the appropriate federal agency, (3) under the federal regulations that apply to FTCA claims, a claim is deemed "presented" to a federal agency only when the claim has actually been "receive[d]" by the agency, 28 C.F.R § 14.2(a), and (4) Decker's administrative remedies for his trespass claim are therefore not exhausted because the Department of Justice never received that claim. (Mot., ECF No. 271, PageID.1853-1857.)

The assigned Magistrate Judge agrees with the United States.  In the R&R, he recommends that the Court grant the United States' motion for summary judgment based upon Decker's failure to exhaust. (*See* R&R, ECF No. 292.)

Decker has now filed objections to the R&R. (*See* Obj., ECF No. 296.)  In his primary objection, he argues that he presented his claim to the Department of Justice – and thus exhausted his administrative remedies – when he gave the claim form to the prison staffer at the Terre Haute correctional facility. (*See id*.)  Stated another way, Decker argues, in effect, that the "prison mailbox rule" – under which a paper prepared by a prison inmate is deemed "filed" with a federal court at the time the

6

paper is delivered to a prison official for mailing, *see infra* at Section (III)(B) –
applies to the presentment of claims under the FTCA.  And he insists that under the
prison mailbox rule, he satisfied the presentment requirement and exhausted his
FTCA remedies when he gave the claim form to the Bureau of Prisons staffer. (*See
id*.)

The Court has carefully reviewed the R&R, Decker's objections, and several
filings from the United States related to Decker's objections, and it is now prepared
to rule on the objections.

## II

When a party objects to portions of a Magistrate Judge's report and
recommendation, the Court reviews those portions de novo. *See* Fed. R. Civ. P.
72(b)(3); *Lyons v. Comm'r of Soc. Sec.*, 351 F.Supp.2d 659, 661 (E.D. Mich. 2004).
The Court has no duty to conduct an independent review of the portions of the R&R
to which the parties did not object. *See Thomas v. Arn*, 474 U.S. 140, 149 (1985).

## III

Decker's primary objection raises a purely legal question: does the prison
mailbox rule apply to the presentment requirement under the FTCA?  Stated another
way, does a prison inmate satisfy the FTCA's presentment requirement by handing
his claim form to prison authorities for mailing to the appropriate federal agency?
Answering those questions is no easy task.  Indeed, those questions – and the

question, more broadly, of whether the prison mailbox rule applies where, as here, an agency's regulations require actual receipt of a document – have divided the federal courts.

For the reasons explained below, the Court concludes that the prison mailbox rule does not apply to the presentment of claims under the FTCA and that a prison inmate's administrative remedies under the FTCA are not exhausted until, among other things, the appropriate federal agency actually receives the prisoner's claim.

## A

The Court begins with a brief overview of the FTCA, including its presentment requirement. "The FTCA waives the sovereign immunity of the United States with respect to tort claims, providing that '[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances.'" *Singleton v. United States*, 277 F.3d 864, 872 (6th Cir. 2002) (quoting 28 U.S.C. § 2674), *overruled on other grounds by Hawver v. United States*, 808 F.3d 693 (6th Cir. 2015).  But an FTCA claimant may not take advantage of this waiver and file suit against the United States "until [he] ha[s] exhausted [his] administrative remedies." *McNeil v. United States*, 508 U.S. 106, 113 (1993).  And the FTCA provides that in order for a claimant to exhaust his remedies for a claim under the Act, the claimant must present the claim to the right federal agency:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the plaintiff shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.

28 U.S.C. § 2675(a).

The FTCA, itself, does not include a definition of the term "presented." But that term is defined in the regulations that implement the FTCA. Those regulations provide that a claim under the FTCA "shall be deemed to have been presented" to the appropriate federal agency "when" the claim is "receive[d]" by the agency. 28 C.F.R. § 14.2(a). Thus, the general rule is that an FTCA's claimant's claim is not presented – and thus the administrative remedies for that claim are not exhausted – until the claim has actually been received by the federal agency against whom it is asserted. *See, e.g.*, *Lightfoot v. United States*, 564 F.3d 625, 628 (3d Cir. 2009) (explaining that "the term 'presented' in the filing of an administrative claim means more than merely mailing the claim" and "holding that a plaintiff must demonstrate that the Federal agency was in actual receipt of the claim").

**B**

As noted above, the question here is whether the general rule under the FTCA that presentment requires actual receipt applies to claims by prison inmates.

Answering that question requires careful review of the two leading Supreme Court decisions addressing the effect, if any, of a prison inmate's delivery of legal documents to a prison official for mailing to a court or government agency.

The first of those decisions is *Houston v. Lack*, 487 U.S. 266, 270 (1988).  In *Houston*, the Supreme Court addressed "whether under Federal Rule of Appellate Procedure 4(a)(1) [which sets a 30-day deadline for the filing of a notice of appeal], such notices [of appeal] are to be considered filed at the moment of delivery to prison authorities for forwarding [to a court] or at some later point in time." *Id.* at 268.  The Supreme Court held that for purposes of that rule, a prisoner's notice of appeal is filed when he "deliver[s] the notice to the prison authorities for forwarding to the District Court." *Id.* at 270.  In a passage worth quoting at length, the Supreme Court explained that deeming the notice filed upon delivery to the prison officials for mailing was essential in order to ensure that inmates who wish to appeal *pro se* have full and fair access to the appellate process:

> The situation of prisoners seeking to appeal without the aid of counsel is unique. Such prisoners cannot take the steps other litigants can take to monitor the processing of their notices of appeal and to ensure that the court clerk receives and stamps their notices of appeal before the 30-day deadline. Unlike other litigants, *pro se* prisoners cannot personally travel to the courthouse to see that the notice is stamped "filed" or to establish the date on which the court received the notice. Other litigants may choose to entrust their appeals to the vagaries of the mail and the clerk's process for stamping incoming papers, but only the *pro se* prisoner is forced to do so by his situation. And if

other litigants do choose to use the mail, they can at least place the notice directly into the hands of the United States Postal Service (or a private express carrier); and they can follow its progress by calling the court to determine whether the notice has been received and stamped, knowing that if the mail goes awry they can personally deliver notice at the last moment or that their monitoring will provide them with evidence to demonstrate either excusable neglect or that the notice was not stamped on the date the court received it. *Pro se* prisoners cannot take any of these precautions; nor, by definition, do they have lawyers who can take these precautions for them. Worse, the *pro se* prisoner has no choice but to entrust the forwarding of his notice of appeal to prison authorities whom he cannot control or supervise and who may have every incentive to delay. No matter how far in advance the *pro se* prisoner delivers his notice to the prison authorities, he can never be *sure* that it will ultimately get stamped "filed" on time. And if there is a delay the prisoner suspects is attributable to the prison authorities, he is unlikely to have any means of proving it, for his confinement prevents him from monitoring the process sufficiently to distinguish delay on the part of prison authorities from slow mail service or the court clerk's failure to stamp the notice on the date received. Unskilled in law, unaided by counsel, and unable to leave the prison, his control over the processing of his notice necessarily ceases as soon as he hands it over to the only public officials to whom he has access-the prison authorities-and the only information he will likely have is the date he delivered the notice to those prison authorities and the date ultimately stamped on his notice.

*Id.* at 270-72.

Importantly, the Supreme Court said that it was appropriate to consider these equitable considerations because Rule 4(a) did not "set[] forth criteria for determining the moment at which the 'filing' has occurred" and because the

applicable federal statute, 28 U.S.C. § 2017 (setting forth a 30-day time limit for the filing of a notice of appeal in a habeas action), did "not define when a notice of appeal has been 'filed.'" *Id.* at 272-73.

The second decision is *Fex v. Michigan*, 507 U.S. 43 (1993). *Fex* involved the Interstate Agreement on Detainers (the "IAD"). A "detainer" is "a request filed by a criminal justice agency with the institution in which a prisoner is incarcerated, asking that the prisoner be held for the agency, or that the agency be advised when the prisoner's release is imminent." *Id.* at 45. Thus, for instance, if an inmate is being held in an Indiana prison and Michigan authorities have charged him with an offense committed in Michigan, the Michigan authorities would lodge a detainer with the Indiana prison at which the inmate is housed.

*Fex* turned on a provision of Article III of the IAD. In relevant part, that Article provides:

> Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party State, and whenever during the continuance of the term of imprisonment there is pending in any other party State any untried indictment, information, or complaint on the basis of which a detainer has been lodged against the prisoner, *he shall be brought to trial within one hundred and eighty days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information, or complaint.*

*Id*. at 45 n.1 (quoting 18 U.S.C.A. § 2) (emphasis added).

The petitioner in *Fex* was an inmate in an Indiana prison.  The Jackson County prosecutor in Michigan filed a detainer with the prison that housed the petitioner. On September 7, 1988, the petitioner "gave" to the Indiana prison authorities "his request for final disposition of the Michigan charges." *Id.* at 46.  On September 22, 1988, "the prison authorities mailed the petitioner's request." *Id.*  On September 26, 1988, "the Jackson County Prosecuting Attorney and the Jackson County Circuit Court received it." *Id.*  "Petitioner's trial on the Michigan charges began on March 22, 1989, 177 days after his request was delivered to the Michigan officials and 196 days after petitioner gave his request to the Indiana prison authorities." *Id.*

"Prior to trial, petitioner [had] moved for dismissal with prejudice … on the ground that his trial would not begin until after the 180-day time limit set forth" in the provision of Article III quoted above. *Id.*  "The trial court denied the motion, reasoning that the 180-day time limit did not commence until the Michigan prosecutor's office received petitioner's request." *Id.*  The Michigan Court of Appeals reversed on the basis that "the commencement of the 180-day statutory period was triggered" when the petitioner delivered his request for disposition to the prison officials in Indiana. *Id.*  The Michigan Supreme Court then summarily reversed and held that the 180-day period did not commence until the prosecutor

"actual[ly] received]" the petitioner's request for disposition. *People v. Fex*, 479 N.W.2d 625, 626 (Mich. 1992).

The United States Supreme Court affirmed the judgment of the Michigan Supreme Court and held that "the 180-day time period in Article III(a) of the IAD does not commence until the prisoner's request for final disposition of the charges against him has actually been delivered to the court and prosecuting officer of the jurisdiction that lodged the detainer against him." *Fex*, 507 U.S. at 52. Before announcing that holding, the Supreme Court took up and rejected the petitioner's argument that "a prisoner's transmittal of [a request for disposition] to the prison authorities" for mailing is sufficient to "commence[] the 180-day period" even if the request never actually arrived at the prosecutor's office. *Id*. at 48. The Supreme Court said that that contention could not be squared with the plain language of the IAD, which required "delivery in fact" (to the prosecuting attorney) to begin the 180-day period. *Id.*

The Supreme Court next turned to a related question: in the event that a prisoner's request for disposition is, in fact, successfully delivered to the prosecuting attorney, should the 180-day period begin from the date of that delivery or from the date that the prisoner gave the request to prison authorities for mailing? *See id.* The Supreme Court determined that even under those circumstances, the 180-day period does not start until delivery to the prosecutor. The Supreme Court noted that the text

14

of the IAD, "alone," was "indeterminate" as to whether, where delivery of the request for disposition to the prosecutor has actually occurred, the 180-day period begins (1) at the time of that delivery or (2) when the prisoner gave the request to prison officials for mailing. So the Supreme Court looked to "what might be called the sense of the matter, and in the import of related provisions" of the IAD. *Id.* at 49. As part of that analysis, the Supreme Court considered the "worst case scenarios" under the two competing options for commencing the 180-day period. *Id.* at 50. The Supreme Court concluded that the starting the 180-day period when the prisoner gives the request for disposition to prison officials for mailing "produces results that are significantly worse" than starting the period when the request is delivered to the prosecuting attorney. *Id.* After evaluating the alternative worst-case scenarios, the Supreme Court reviewed the "text of Article III" of the IAD and concluded that its language "confirm[ed] … that the receiving State's receipt of the request starts the clock." *Id.* at 51.

Finally, the Supreme Court ended its Opinion by addressing the petitioner's "policy argument that '[f]airness requires the burden of compliance with the requirements of the IAD to be placed entirely on the law enforcement officials involved, since the prisoner has little ability to enforce compliance,', and that any other approach would 'frustrate the higher purpose' of the IAD, leaving 'neither a legal nor a practical limit on the length of time prison authorities could delay

forwarding a [request].'" *Id.* at 52 (internal citation omitted; quoting petitioner's brief).   The Supreme Court rejected those arguments because they could not be squared with the plain language of the IAD:

> These arguments, however, assume the availability of a reading that would give effect to a request that is never delivered *at all.* (Otherwise, it remains within the power of the warden to frustrate the IAD by simply not forwarding.) As we have observed, the textual requirement "shall have caused to be delivered" is simply not susceptible of such a reading. Petitioner's "fairness" and "higher purpose" arguments are, in other words, more appropriately addressed to the legislatures of the contracting States, which adopted the IAD's text.

*Id.* at 52 (emphasis in original).   Notably, even though petitioner's "policy" arguments sounded much like the rationale adopted four years earlier in *Houston* – and even though the dissenting Justices suggested that *Houston* was instructive, *see id.* at 58 (Blackmun, J., dissenting) – the Supreme Court in in *Fex* never once mentioned *Houston*.

## C

Ever since the Supreme Court decided *Fex*, federal circuit courts have wrestled with the question of "when *Fex* bars the application of [the prison mailbox rule announced in] *Houston* to a particular deadline." Comment, *Untangling the Prison Mailbox Rules*, 89 U. Chi. L. Rev. 1331, 1347 (Sep. 2022).   While the Sixth

Circuit has not addressed this issue,[3] "most circuits that have considered this issue have held that *Fex* bars application of *Houston* … when a deadline is specifically defined in reference to the date on which a filing is *received*." *Id.* (emphasis in original).  Simply put, the majority view of *Fex* among the circuits is that "when the language of the governing rule clearly defines the requirements for filing" in a manner that requires actual receipt, "the text of the rule should be enforced" and the prison mailbox rule from *Houston* does not apply. *Smith v. Conner*, 250 F.3d 277, 278 (5th Cir. 2001) (declining to apply *Houston's* prison mailbox rule to a prisoner's Notice of Appeal to the Board of Immigration Appeals because the applicable federal regulation provided that such notice is filed "as of the date of receipt … by the Board of Immigration Appeals).  As the Ninth Circuit succinctly put it, "*Fex* instructs that the *Houston* policies cannot override the plain language of a procedural rule." *Nigro v. Sullivan*, 40 F.3d 990, 995 (9th Cir. 1994). *See also Longenette v. Kruising*, 322 F.3d 758, 764 (3d Cir. 2003) (explaining that "*Houston's* narrow holding, therefore, apparently was designed to protect *pro se* prisoners in the absence of a clear statutory or regulatory scheme" and applying *Houston's* prison mailbox rule in the context of administrative forfeiture proceedings because there was no

---

[3] The Sixth Circuit has cited *Fex* in only three decisions. *See United States v. White*, 185 F. App'x 504 (6th Cir. 2006); *United States v. Aldridge*, 85 F.3d 629 (TABLE) (6th Cir. 1996); *Cheek v. Lamanna*, 18 F. App'x 294 (6th Cir. 2001). All were unpublished and all addressed issues arising under the IAD.  None considered the effect of *Fex* on the prison mailbox rule in any context other than the IAD.

"conclusive language" in the governing statute or rule requiring actual receipt);

*Tapia-Ortiz v. Doe*, 171 F.3d 150, 152 n. 1 (2d Cir. 1999) ("*Houston* does not apply,

of course, when there is a specific statutory regime to the contrary.")[4]; *Crook v.*

*Commissioner of Internal Revenue Service*, 173 F. App'x 653, 656 (10th Cir. 2006)

(noting that "the prison mailbox rule does not apply when there is 'a specific

statutory or regulatory regime' governing the filing at issue."). District courts in the

Sixth Circuit and in other circuits have adopted the same view of *Fex*.[5]

---

[4] *Tapia-Ortiz* has engendered a bit of confusion. The Second Circuit appeared to "join[] the majority interpretation" of *Fex* when it concluded that the prison mailbox rule does not apply in the face of statutory language requiring actual receipt. Comment, 89 U. Chi. L. Rev. at 1351. However, the Second Circuit then applied the prison mailbox rule to an FTCA administrative claim even though, as noted above, the FTCA's implementing regulations provide that a claim is presented only when it is received. Thus, it could, perhaps, be possible to read *Tapia-Ortiz* as holding that while the prison mailbox rule does not apply in the face of a statute that requires receipt, it does apply in the face of a *regulation* that expressly requires receipt. However, the Second Circuit did not cite, nor even acknowledge, the FTCA regulation requiring receipt, and it is thus not clear that the court was aware of it. For these reasons, the import of *Tapia-Ortiz* is not entirely clear.

[5] *See, e.g., Goddard v. Alexakos*, Civil Action No. 5:16-215, 2018 WL 1168611, at *6 (E.D. Ky. Mar. 6, 2018) (explaining that "courts have declined to apply the prison mailbox in circumstances where statutory or regulatory schemes define what constitutes 'filing'" and declining to apply the rule to administrative appeal filed by prison inmate where the governing federal regulation provided that the "appeal is considered "filed' on the date it is received."); *Cordoba v. Shartle*, No. 4:09-cv-3015, 2010 WL 2572854, at *4 (N.D. Ohio June 23, 2010) (concluding that it was appropriate to apply the prison mailbox rule because the applicable statute and regulations did *not* require actual receipt); *Lakin v. U.S. Dep't of Justice*, 917 F.Supp.2d 142, 145 (D.D.C. 2013) (explaining that prison mailbox rule did not apply to administrative proceedings that specifically required *receipt* by a certain deadline because rule was "precluded by [the] specific statutory or regulatory regime" that required receipt); *In re Looper*, 334 B.R. 596, 601 (Bkrtcy. E.D. Tenn. 2005)

18

Only the Seventh Circuit has "broke[n] from this interpretation of *Fex*." Comment, 89 U. Chi. L. Rev. at 1348.  That court does "not read [*Fex*] to stand for any broad principle that the prison-mailbox rule can apply only in a regulatory void," *i.e.*, only where a statute or rule does not define filing to require actual receipt. *Censke v. United States*, 947 F.3d 488, 492 (7th Cir. 2020).  Instead, the Seventh Circuit interprets *Fex* to "apply" a "balance of the harms approach" and to permit application of the prison mailbox rule where the adverse consequences to a prisoner of not applying the rule would exceed the harm to a government agency if the rule were to be applied. *Id.* at 493.

This Court finds the majority view of the relationship between *Houston* and *Fex* – that under *Fex* the prison mailbox rule from *Houston* does not apply where the governing statutes and rules define filing to require actual receipt – most persuasive. Reconciling *Houston* and *Fex* in that way is most faithful to key considerations in both of those decisions.  As noted above, the Supreme Court in *Houston* highlighted that it was appropriate to consider equitable considerations and filing challenges facing prisoners because the rule at issue did *not* define filing to include receipt.  In

---

("[W]hen the statute or administrative procedure expressly defines 'filing' and/or 'service,' the prisoner mailbox rule does not apply" (quoting *Fex*, 507 U.S. at 52)); *Slusser v. Holzapfel*, No. 5:21-cv-00544, 2023 WL 8817575, at *4 (S.D. W. Va. Aug. 7, 2023) (declining to apply the prison mailbox rule where governing regulation provided that filing occurs on receipt), report and recommendation, adopted at 2023 WL 8813921 (S.D. W. Va. Dec. 20, 2023).

contrast, the court in *Fex* focused closely on the fact that the text of the IAD required actual "delivery" of a prisoner's request for disposition, and it rejected what was, in essence, a prison-mailbox-rule argument made by the petitioner because it was inconsistent with the language of the IAD.

Moreover, the Court agrees with the leading scholarly commentary's rationale for adopting the majority view of *Fex* and *Houston* rather than the Seventh Circuit's approach:

> Resolution of the circuit split should, of course, turn mainly on the proper reading of *Fex*. There is some support for the Seventh Circuit's interpretation of *Fex*. The *Fex* Court did note that the worst-case scenario under a prison mailbox rule would be "significantly worse" than without such a rule.
>
> However, the better reading of *Fex* is that it turned on the specificity of the language in the applicable deadline, as most circuits have held. Most of the Court's opinion closely scrutinizes the text of the statutory deadline at issue. Noting that the "present case turns upon the meaning of the phrase ... 'within one hundred and eighty days after he shall have caused to be delivered,'" the Court stated that it was self-evident that "no one can have 'caused something to be delivered' unless delivery in fact occurs." The Court then undertook a grammatical analysis of the deadline and stated that "[i]t makes more sense to think that, as respondent contends, delivery is the key concept."
>
> Indeed, the *Fex* Court offered its worst-case scenario rationale as just "[a]nother commonsense indication pointing to the same conclusion" that it had already reached through interpreting the deadline's text. It then rejected the prisoner's policy arguments in favor of

reading a prison mailbox rule into the deadline by reiterating that "the textual requirement 'shall have caused to be delivered' is simply not susceptible of such a reading."

A complete reading of the Court's opinion in *Fex* thus clearly gives more support to the circuits that focus on the specific language governing a deadline. Under this approach, courts should not apply *Fex* to any deadlines that are defined merely by reference to filing, serving, presenting, or similarly ambiguous terms. However, in situations when a deadline is specifically defined in relation to delivery or receipt, whether in the text of the deadline itself or in regulations interpreting the deadline, courts should hold that *Fex* bars application of a prison mailbox rule.

Comment, 89 U. Chi. L. Rev. at 1349-50.

For all of these reasons, the Court concludes that *Houston* and *Fex*, together, establish the following rule: the prison mailbox rule does not apply where the governing statute or rule defines filing to require actual receipt.[6]

---

[6] As noted above, the Sixth Circuit has not decided how *Fex* impacts the prison mailbox rule from *Houston*. But the results of two of its unpublished decisions are consistent with the majority view set forth above. First, in *Petrovic v. United States*, No. 17-6186, 2018 WL 4959031 (6th Cir. June 8, 2018), the court held that the plaintiff failed to exhaust his FTCA claim because the claim had not been received by the appropriate federal agency. That result appears to align with the majority approach because, as noted above, that approach focuses on the language of the governing statute and/or regulation, and, as further noted above, the FTCA's implementing regulations provide that an administrative claim is presented – and thus exhausted – only when it is received by the agency. However, *Petrovic* contains no substantial analysis of the exhaustion issue, does not mention the prison mailbox rule, does not cite *Fex*, and does not even cite the FTCA regulation that ties presentment to receipt. The Court thus concludes that *Petrovic* has limited persuasive value as to the scope of the prison mailbox rule. Second, in *Hampton v.*

**D**

Applying that rule here, the Court must conclude that the prison mailbox rule does not apply to the presentment of administrative claims under the FTCA.  As noted above, the FTCA's implementing regulations provide that an administrative claim "shall be deemed to have been presented when a Federal agency receives from a claimant" a properly executed claim form, "accompanied by a claim for money damages in a sum certain…." 28 C.F.R. § 14.2(a).  Because the regulations expressly provide that presentment requires receipt, the prison mailbox rule "does not apply to FTCA administrative claims," *Russell v. United States*, C.A. No. 1:23-1019, 2024 WL 446088, at *5-6 (D.S.C. Feb. 6, 2024), and an administrative claim under the FTCA is presented to the appropriate federal agency only when it is received by that agency.[7]

---

*Williams*, Nos. 20-3158/3420, 2021 WL 3519333, at *2 (6th Cir. Apr. 28, 2021), the Sixth Circuit said in *dicta* that it "has never held that the prison-mailbox rule applies to prison administrative proceedings," and in support of that observation, the court cited the applicable federal regulation which provided that a prison administrative appeal is filed when it is "logged into" the Bureau of Prison's system "as received." *Id.* (quoting 28 C.F.R. § 542.18).  The Court does not find that *dicta*, which makes no reference to *Fex* and contains no real analysis, to provide any substantial guidance at to the applicability of the prison mailbox rule.

[7] While the Court concludes that the prison mailbox rule does not apply to FTCA administrative claims, the Court does not reach that conclusion based upon the cases cited by the United States or in the R&R (*see* Mot., ECF No. 271, PageID.1854-1857; R&R, ECF No. 292, PageID.2096 n. 10), because with only three exceptions, those cases involved non-prisoner plaintiffs and did not address the prison mailbox rule – a rule that is justified by special challenges facing *prisoners*.  Instead, those cases applied the general rule under the FTCA that presentment requires receipt

**E**

Since the undisputed evidence in this case shows that the Department of Justice did not receive Decker's FTCA administrative claim, he did not present the claim, and he therefore may not pursue the claim in this action. The Court therefore **OVERRULES** Decker's objection to the R&R in which he contends that he presented his claim by giving it to prison officials for mailing.

The Court recognizes the seeming unfairness of this result. Assuming the truth of Decker's sworn statements (which the Court must do at this point), Decker appears to have done nearly everything he could do in order to present his FTCA claim to the Department of Justice. He gave it to prison staff, and he was at their mercy as to whether they would forward the claim along. If Decker is to be believed, they apparently did not do so. And he must now pay the price by losing out on the opportunity to pursue his FTCA claim.

---

without considering the impact, if any, of the prison mailbox rule. And the three cases that did involve incarcerated plaintiffs are not particularly instructive with respect to whether the prison mailbox rule applies to the presentment of FTCA claims. First, the decision in *Brooks v. Silva*, No. 13-6539, 2015 WL 12762112 (6th Cir. Apr. 6, 2015), cited in the R&R (*see* R&R, ECF No. 292, PageID.2096), did not turn on the presentment requirement under the FTCA and did not mention the prison mailbox rule. Second, while the court in *Dock v. Wilson*, No. 17-11421, 2018 WL 4576678 (E.D. Mich. Sept. 25, 2018), also cited in the R&R (*see* R&R, ECF No. 292, PageID.2096), did say that "virtually every circuit" had declined to apply the mailbox rule to an FTCA claim, the cited circuit court cases did not involve prisoner-plaintiffs or the *prison* mailbox rule. Finally, for the reasons explained above (*see supra* at n. 5), the *Petrovic* decision, cited in the R&R (*see id.*), does not clearly establish that the prison mailbox is inapplicable to FTCA administrative claims.

But *Fex* makes clear that fairness concerns like these do not carry the day where, as here, a regulation requires actual receipt.   Indeed, *Fex* "instructs that *Houston* policies [concerning the equities that support application of the prison mailbox rule] cannot override the plain meaning of a procedural rule." *Nigro*, 40 F.3d at 995 (declining to apply prison mailbox rule in face of regulation that required actual receipt).   And this Court "cannot in the name of sympathy rewrite" that rule. *Id.*   For all of these reasons, the Court must overrule Decker's objections related to his claimed exhaustion of his administrative remedies.

## IV

Decker's remaining objections all arise out of his contentions that he has been denied the opportunity to meaningfully respond to the United States' summary judgment motion and the R&R.   Decker says that he could not effectively address the motion and the R&R because, among other things, he has been separated from his legal materials for various periods of time, and the halfway house at which he was housed lacked access to the internet, a phone, paper, stamps, and envelopes. (*See, e.g.*, Obj., ECF No. 296; Mots., ECF Nos. 297, 300, 304; Letter, ECF No. 305.) For several reasons, the Court rejects Decker's contention that he was prevented from filing sufficient responses to the motion and the R&R.

First, the Court has accommodated Decker by granting him multiple extensions of time to address the motion and the R&R.  For example, after the United

24

States filed its motion for summary judgment, the assigned Magistrate Judge initially provided Decker nearly seven weeks to file his response (*see* Order, ECF No. 272) – more than double the amount of time normally allotted under the Court's Local Rules. *See* E.D. Mich. Local Rule 7.1(e)(2)(A) (setting 21-day deadline for responding to a summary judgment motion). The Magistrate Judge then extended that deadline an additional two and a half months. (*See* Order, ECF No. 278.) All told, Decker had over four months to respond to the United States' summary judgment motion, but he never filed a response.[8] Then, after the Magistrate Judge issued the R&R, this Court granted Decker extensions of time to file objections (and then supplemental objections) to the R&R. (*See* Orders, ECF Nos. 294, 302.) These significant extensions of time have given Decker sufficient time to file his responses with the Court.

Second, the Court has taken steps to address Decker's claimed lack of access to the relevant court filings. For example, in response to Decker's repeated assertions that he does not have copies of the United States' summary judgment motion and the R&R, the Court has twice ordered the United States to *re*-serve on Decker, at the Government's expense, (1) its motion for summary judgment and (2)

---

[8] The Magistrate Judge even tried to appoint counsel for Decker, granting his motion to appoint counsel for the limited purpose of responding to the United States' summary judgment motion. (*See* Order, ECF No. 278.) But Decker later withdrew his request for counsel (*see* ECF No. 281), and the Magistrate Judge rescinded his appointment order (*see* Order, ECF No. 282).

the R&R. (*See id.*)  Thus, the Court has ensured, twice, that Decker has additional copies of the relevant legal materials so that he can file substantive objections to the R&R.

Third, Decker's claim that he lacks the ability to conduct legal research on the internet or use a computer is not accurate.  The United States has presented evidence that inmates like Decker residing at a halfway house "may ask for a pass to visit a local library to" conduct internet research and/or to use computers. (Decl. of Matthew Call, Supervisory Residential Reentry Specialist with the Federal Bureau of Prisons, at ¶ 4, ECF No. 307-2, PageID.2154.)  But instead of taking advantage of those opportunities, Decker "cut off his GPS monitoring unit" and escaped from the halfway house at which he lived. (*Id.* at ¶ 3, PageID.2154.)  Having chosen to escape the halfway house, Decker is hardly in a position to complain about its claimed lack of resources.

Finally, Decker's claim that he lacks access to paper, stamps, and envelopes (*see* Letter, ECF No. 305) is also not accurate.  Indeed, Decker has repeatedly mailed to the Court documents that he either wrote or typed, including motions, letters, change of address forms, and objections to the R&R. (*See, e.g.*, Obj., ECF No. 296; Mots., ECF Nos. 297, 300, 304; Letter, ECF No. 305; Change of Address forms, ECF Nos. 283, 284, 300, 306.)  Thus, Decker has shown that he is fully capable of completing and mailing documents with the Court.  Moreover, the United States has

presented evidence that inmates like Decker who live in halfway houses "generally have the opportunity to buy stamps, envelopes, and paper in the community, where such items are readily available." (Call Decl., at ¶ 5, ECF No. 307-2, PageID.2154.) In addition, "indigent inmates [may] request free stamps for legal material" with the Bureau of Prisons, but there is no record of Decker ever making such a request. (*Id.*)

For all of these reasons (and with all of the accommodations that the Court has extended the Decker), the Court is persuaded that he has had a sufficient opportunity to respond to the United States' motion and to the R&R.  The Court therefore **OVERRULES** Decker's remaining objections.

V

The Court concludes by addressing Decker's currently-pending motion to appoint counsel. (*See* Mot., ECF No. 304.)  Decker says that he needs counsel because he has "no access to legal materials, phone, [or] internet." (*Id.*, PageID.2138.)  As the Court has previously explained to Decker, there is no constitutional right to the appointment of counsel in civil cases. (*See* Order, ECF No. 294, PageID.2107.)  Based on Decker's previous filings in this case – which have prevented thoughtful and reasonably sophisticated legal arguments to the Court (*see, e.g.*, Resp. to Mot. to Dismiss, ECF No. 194; Objection, ECF No. 214) – the Court continues to believe that Decker is fully capable of responding to the R&R without counsel.  Moreover, for all of the reasons explained immediately above, the Court

does not find credible Decker's assertions that he cannot meaningfully respond to the R&R because he lacks the relevant legal materials or access to a computer or the internet.  For all of these reasons, Decker's motion to appoint counsel is **DENIED**.

VI

For all of the reasons explained above, **IT IS HEREBY ORDERED** that:

- Decker's objections (ECF No. 296) to the R&R (ECF No. 292) are **OVERRULED**;

- Decker's motion for the appointment of counsel (ECF No. 304) is **DENIED**; and

- The United States' motion for summary judgment (ECF No. 271) is **GRANTED** on the basis that Decker failed to exhaust his administrative remedies.

s/Matthew F. Leitman<br>
MATTHEW F. LEITMAN<br>
UNITED STATES DISTRICT JUDGE

Dated:  September 10, 2025

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 10, 2025, by electronic means and/or ordinary mail.

s/Holly A. Ryan<br>
Case Manager<br>
(313) 234-5126

28